UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMEEN JAMALEDDIN,

       Plaintiff,                                Case No. 13-cv-12735
                                              Hon. Matthew F. Leitman

v.

OAKLAND PHYSICIANS MEDICAL
CENTER, L.L.C. et al.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF #18)

In February 2011, Defendant Oakland Physicians Medical Center, L.L.C., ("Oakland") hired Plaintiff Dr. Ameen Jamaleddin ("Jamaleddin") as a first-year medical resident. Jamaleddin's direct supervisor was Defendant Dr. Nikhil Hemady ("Hemady"). Jamaleddin claims that Oakland and Hemady discriminated against him during his employment and ultimately forced him to resign from his residency program. In this action, Jamaleddin asserts claims for (1) discrimination based on national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq. ("Title VII"), and Michigan's Elliot-Larsen Civil Rights Act, MCL 37.201 et. seq. (the "ELCRA"); (2) retaliation in violation of Title VII and the ELCRA; and (3) breach of his residency employment contract. (*See* Complaint, ECF #1.) Defendants have filed a motion for summary judgment. (*See*

1

ECF #18.) For the reasons stated below, the Court **DENIES** summary judgment on Jamaleddin's national origin discrimination and breach of contract claims but **GRANTS** summary judgment with respect to Jamaleddin's retaliatory harassment claims.

## RELEVANT FACTUAL BACKGROUND

On February 25, 2011, Jamaleddin, who is of Arabic descent, and Oakland executed a "Residency Agreement" in which Oakland "offer[ed] and [Jamaleddin] accept[ed] appointment as a first year resident in Family Medicine for the year beginning July 1, 2011 and ending June 30, 2012." (*See* the "Residency Agreement," ECF #21-2 at § I, Pg. ID 792.) Among other things, the Residency Agreement stated that the "Program Director" of the Family Medicine Department – Defendant Hemady – "shall determine [Jamaleddin's] duties and responsibilities [], including [Jamaleddin's] hours of duty…." (*Id.* at § III, Pg. ID 792.) Oakland also "agree[d] to provide [Jamaleddin] a training program that meets the standards established in the essentials of approved residencies as formulated by the Accreditation Council on Graduate Medical Education of the American Medical Association." (*Id.* at § II, Pg. ID 792.) Finally, as relevant to this action, the Residency Agreement included an anti-discrimination provision that stated that Oakland "shall not discriminate against [Jamaleddin] based on race, color, religion, sex, [or] national origin … and shall conduct itself in compliance with the various

2

state and federal laws and Hospital policies which prohibit employment discrimination." (*Id.* at § VIII, ¶ B, Pg. ID 794.)

Jamaleddin began his residency program in July 2011, and conflicts arose between Jamaleddin and Hemady almost immediately. For example, Jamaleddin says that during his orientation, Hemady told Jamaleddin that he needed to "give up" his "Arab mentality." (Jamaleddin Deposition, Exhibit H to ECF #21-3 at 95, Pg. ID 941.) On another occasion, Hemady allegedly asked Jamaleddin if he was using "Arabic time." (*Id.* at 96, Pg. ID 941.) Jamaleddin also says that while he received favorable reviews from some of the physicians he worked with (*see, e.g.,* Exhibit D to ECF #21-2, Pg. ID 851-882), Hemady "refused to meet with [Jamaleddin] and evaluate [Jamaleddin]." (Jamaleddin Dep. at 97, Pg. ID 941.) According to Jamaleddin:

> Dr. Hemady never met with me to evaluate me, to train me, to talk to me like the other residents he does. He never really gave me the environment of teaching and caring that he gives to the other residents.
>
> [….]
>
> The program director is like my father. If he chooses not to train me, not to show me things, then I'm just cut out of the whole program, basically. [Hemady] was not meeting with me, he's not evaluating me, he's not educating me.

(*Id.* at 139, Pg. ID 952.)

In September 2011, Hemady e-mailed Jamaleddin regarding concerns Hemady had with Jamaleddin's performance.  (*See* Exhibit F to ECF #21-2, Pg. ID 910.)  In that e-mail, Hemady chastised Jamaleddin for "not logg[ing] [his] duty hours for the last two weeks," for failing to "turn[] in his resident self-assessment document," and for wearing "scrubs [] when seeing patients in the Family Medicine Center," which Hemady noted "is against the residency program policy." (*Id.*)  Hemady further told Jamaleddin that:

> You have been verbally warned over the past few months by a number of individuals (including your faculty advisor and chief residents) because of several concerns regarding your professionalism, and interpersonal and communication skills.  Hence, if you do not perform the duties and responsibilities of a resident as required by the program and institution, there will be disciplinary action taken against you, including the possibility of being terminated from the residency program.

(*Id.*)   Jamaleddin disputes Hemady's assertion regarding improperly logged duty hours.  (*See* Jamaleddin Dep. at 28-30, Pg. ID 924-925.)  Further, Jamaleddin says that after receiving Hemady's e-mail, he turned in his self-assessment form as directed and never again wore scrubs in the Family Medicine Center.  (*See id.*)

An incident that occurred on November 3, 2011, precipitated the end of Jamaleddin's employment at Oakland.  Jamaleddin began working at 7:00 a.m. that day.  (*See id.* at 81, Pg. ID 937.)  Jamaleddin was scheduled to work until 9:00 p.m., and he was scheduled to begin another shift at 7:00 a.m. the following day.

4

(*See id.*; *see also id.* at 137-141, Pg. ID 951-952.) Jamaleddin says that early in his shift, he spoke with Hemady and voiced his concern that Oakland was forcing him to work too many hours without sufficient breaks between shifts. (*See id.* at 98-99, Pg. ID 942.) According to Jamaleddin, he told Hemady that he believed he was being "discriminated [against] because of [his] Arabic decent." (*Id.* at 98, Pg. ID 942.)

Later that evening, near the end of Jamaleddin's shift, Dr. Henry Fosah, the floor chief resident, asked Jamaleddin to draft a patient history. (*See id.* at 78-79.) Jamaleddin agreed to draft the history, but he then became concerned that he would not have time to complete the assignment before the end of his shift. (*Id.*) Jamaleddin says he did not want to stay late to complete the history because he needed to sleep before returning to the hospital at 7:00 a.m. the next morning. (*See id.* at 89.)

Around 9:00 p.m., Jamaleddin asked another physician, Dr. Basmal Yaldo ("Yaldo"), to complete the history for him, and Yaldo agreed. (*See id.* at 88.) Jamaleddin then left the hospital. (*See id.*) Jamaleddin insists he had "permission" to leave from Yaldo, who assured Jamaleddin that he (Yaldo) would complete the history that night. (*See id.*)

Shortly after returning home to rest in preparation for his shift the next day, Jamaleddin received a page from Yaldo. (*See id.* at 135, Pg. ID 951.) Yaldo told

Jamaleddin that Hemady (1) found out that Jamaleddin had asked Yaldo to draft the patient history and (2) told Yaldo to stop working on the assignment. (*See id.*) Jamaleddin concedes that he then asked Yaldo to complete the history "in a way where Dr. Hemady doesn't see you," but Yaldo refused. (*Id.* at 89-90, Pg. ID 939-940.) Jamaleddin then returned to the hospital and completed the history as originally assigned. (*Id.* at 136-137, Pg. ID 951.)

Jamaleddin says that Defendants fired him one week later, on November 10. (*See id.* at 91-93, Pg. ID 940.) On that day, Hemady, accompanied by an Oakland human resources employee and two chief residents, met with Jamaleddin. (*See* Hemady Deposition, Exhibit B to ECF #21-2 at 136-137, Pg. ID 830.) Hemady says that during that meeting, he gave Jamaleddin a letter he drafted that "formally notif[ied]" Jamaleddin that his "employment as a Family Medicine resident … is being terminated…." (The "Termination Letter," ECF #18-4 at 5, Pg. ID 147.) A copy of the letter was also placed in Jamaleddin's personnel file. (*See* ECF #18-4.) The Termination Letter stated that Oakland was terminating Jamaleddin's employment because he "refused to complete [his] assigned patient care responsibilities (i.e. history and physical on an admitted patient) while on call…." (*See id.* at 5, Pg. ID 147.) The Termination Letter described Jamaleddin's actions as a "gross dereliction of patient care responsibilities [that] mounted [sic] to insubordination of [his] superiors, including the chief resident, senior resident and

6

the Program Director." (*Id.*)   The Termination Letter also reiterated that Jamaleddin had "been warned verbally and in writing of several concerns regarding [his] professionalism, and interpersonal and communication skills." (*Id.*) The Termination Letter next said that "[t]he Program Oversight Committee, along with resident representatives, reviewed the [November 3] incident and was unanimous in its decision to terminate your employment as a resident in the residency program." (*Id.*)   The Termination Letter concluded by informing Jamaleddin that he had the "right to appeal this decision of termination." (*Id.*)  At the bottom of the Termination Letter, there was a space for Jamaleddin to sign and confirm that he had "received a copy of the Graduate Medical Education's policy on Resident Grievance Procedure and Due Process Policy" and that he "underst[ood] that [he had] the right to appeal this decision, but must submit a written request for a hearing to Dr. Hemady by 9 am on November 17, 2011." (*Id.*)

Jamaleddin never appealed his termination.   Jamaleddin says Hemady frustrated his right to appeal and forced Jamaleddin to sign a different document in which Jamaleddin formally resigned from the residency program.  (*See* the "Resignation Form," ECF #18-4 at 4, Pg. ID 146.)  Jamaleddin asserts that Hemady told him that if he appealed his termination rather than signing the Resignation Form, he would "not win [his] appeal."  (Jamaleddin Dep. at 107, Pg.

7

ID 944.)  According to Jamaleddin, Hemady told him: "I will make sure you lose because I'm the one who's in charge of the appeal."  (*Id.*)  Jamaleddin insists that he did not want to resign, but that Hemady further threatened that if Jamaleddin refused to sign the Resignation Form, Hemady would not write Jamaleddin a letter of recommendation and would "make sure [Jamaleddin] end[s] up nowhere."  (*Id.*)

## PROCEDURAL HISTORY

On June 20, 2013, Jamaleddin filed this action against Defendants.  (*See* Compl.)  In his Complaint, Jamaleddin alleged that Defendants discriminated against him due to his national origin in violation of both Title VII and the ELCRA.  (*See id.* at ¶¶58-73, 87-99.)  Jamaleddin also alleged that he "engaged in an activity protected under Title VII [and the ELCRA] when he reported and complained about the discriminatory conduct and comments to which he was subjected" (*id.* at ¶¶81, 102), and that as a result of these complaints, he was "subjected to severe or pervasive retaliatory harassment." (*Id.* at ¶¶85, 105.) Finally, Jamaleddin claimed that Oakland breached the Residency Agreement by, among other things, "[f]ailing to provide [Jamaleddin] with a training program…" and "[d]iscriminating against [Jamaleddin] based on his national origin…." (*Id.* at ¶111.)

Defendants filed their summary judgment motion on May 15, 2014.  (*See* ECF #18.)  The Court heard oral argument on the Motion on October 15, 2014, and

8

ordered the parties to submit supplemental briefs.  (*See* ECF #25.)  The Court now grants in part and denies in part Defendants' motion.

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." U.*S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326–27 (6th Cir.2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. However, summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–252. When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge ..." *Id.* at 255.

## ANALYSIS

**A.   Defendants Are Not Entitled to Summary Judgment on Jamaleddin's Title VII and ELCRA Discrimination Claims (Counts I and III of the Complaint)**

Jamaleddin's national origin discrimination claims under Title VII and the

9

ELCRA (counts I and III of his Complaint) are "analyzed under the same evidentiary framework." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). To establish a Title VII or ELCRA employment discrimination claim, Jamaleddin must "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discrimination." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-865 (6th Cir. 2003). Where, as here, Jamaleddin attempts to present circumstantial evidence of discrimination, the claim is evaluated under the familiar analysis described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-805 (1973). Under this test, Jamaleddin has the initial burden to demonstrate a *prima facie* case of discrimination. Jamaleddin may establish a *prima facie* case by showing that: "(1) he is a member of a protected class; (2) he was terminated; (3) he was qualified for the position; and (4) he was replaced by a person outside a protected class or was treated differently than a similarly situated, non-protected employee." *Abdulnour v. Campbell Soup Supply Co.,* 502 F.3d 496, 501 (6th Cir. 2007). If Jamaleddin establishes a *prima facie* case, the burden shifts to Defendants to produce a "legitimate, non-discriminatory reason" for their actions. *Id.* at 502. Finally, if Defendants meet this burden of production, the onus shifts back to Jamaleddin to demonstrate that Defendants' proffered reason is pretextual. *See id.*

Defendants argue that Jamaleddin has failed to establish a *prima facie* case of discrimination because he has failed to show that he was (a) terminated, (b) qualified for his position, and (c) replaced by a person outside a protected class or was treated differently than a similarly situated, non-protected employee. (*See* Def.s' Brief, ECF #18 at 13-15, Pg. ID 125-127.)   This Court disagrees. Drawing all inferences in Jamaleddin's favor, the Court finds that Jamaleddin has stated a *prima facie* case of discrimination.

Defendants first argue that Jamaleddin cannot show that he was terminated from his employment because he, in fact, *resigned* from the residency program. But, while it is true that Jamaleddin signed the Resignation Form (*see* ECF #18-4 at 4, Pg. ID 146), it is undisputed that Oakland issued the Termination Letter to Jamaleddin before he signed that form.   The Termination Letter stated, in unambiguous terms, that Jamaleddin's "employment as a Family Medicine resident … is being terminated…." (*Id.* at 5, Pg. ID 147).   Moreover, Jamaleddin testified that he did not want to sign the Resignation Form, and that the only reason he did was due to Hemady's threats. (*See* Jamaleddin Dep. at 91-93, Pg. ID 940.)   The evidence on the termination issue, when viewed in the light most favorable to Jamaleddin, is sufficient to satisfy the termination element of Jamaleddin's *prima facie* case.

11

Second, Defendants appear to argue that Jamaleddin cannot show that he was qualified for his position because of his "behavior and professionalism." (Def.s' Br. at 13, Pg. ID 125.)  However, Jamaleddin has presented evidence of positive reviews from doctors he worked with. (*See, e.g.,* Exhibit D to ECF #21-2, Pg. ID 851-882.)  Jamaleddin has also shown that once he learned of certain issues Hemady had raised with respect to his "behavior and professionalism," he immediately corrected and remedied those alleged deficiencies.   (*See* Jamaleddin Dep. at 28-30, Pg. ID 924-925.)   The evidence concerning Jamaleddin's qualifications, when viewed in the light most favorable to him, is sufficient to establish the qualification element of Jamaleddin's *prima facie* case.

Finally, Defendants argue that Jamaleddin has failed to satisfy the fourth element of his prima facie case by (1) establishing that he was replaced by a person outside of his protected class or (2) identifying a similarly-situated individual outside his protected class who engaged in similar alleged misconduct but who did not face discipline and/or termination of his employment.  The Court agrees that Jamaleddin has failed to make either of these showings.  However, the Court disagrees with Defendants' contention that the absence of these showings is fatal to Jamaleddin's *prima facie* case.

"There are many 'context-dependent ways by which plaintiffs may establish a prima facie case' of discrimination."  *Rachells v. Cingular Wireless Employee*

*Services, LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 704 (6th Cir. 2007)); *see also Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir.2007), *abrogated on other grounds by Lewis Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) ("elements of *prima facie* case are not rigid requirements that all plaintiffs with similar claims must meet regardless of context").  As the United States Court of Appeals for the Sixth Circuit has held, "while a discriminatory inference is *usually*, and perhaps most readily, generated through evidence of unfavorable treatment of the minority plaintiff vis-à-vis similarly-situated individuals, *McDonnell Douglas* and its progeny do not require this *always* be the case."  *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009) (emphasis in original). Thus, "so long as additional evidence exists—beyond showing the first three elements of the *McDonnell Douglas* test—that indicates discriminatory intent in light of common experience, the required 'inference of discrimination' can be made in satisfaction of the *prima facie* case. *This holds true even if the plaintiff is not necessarily able to identify similarly-situated individuals outside of the relevant protected group who were treated more favorably*."  *Id.* at 418 (emphasis added; internal quotation marks omitted)[1].   Simply put, in assessing the sufficiency of the plaintiff's *prima facie*

---

[1] While *Yates* involved allegations of housing, not employment, discrimination, the portions of the *Yates* decision quoted herein discuss the *prima facie* burden generally, and are not limited to the housing context.  And the approach described

case, "[t]he pivotal question is always 'whether, under the particular facts and context of the case at hand the plaintiff has presented sufficient evidence that he suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination.'" *Rachells*, 732 F.3d at 661 (quoting *Clay*, 501 F.3d at 703).

In this case, Jamaleddin's evidence, when viewed in the light most favorable to him, is sufficient to support an inference of unlawful discrimination. Jamaleddin has presented evidence that (1) on several occasions and in material respects Defendants treated him less favorably than his non-Arabic counterparts and (2) Hemady made anti-Arabic comments that could be deemed to reflect a discriminatory animus. For example, as discussed above, Jamaleddin says that although Hemady frequently taught and evaluated other non-Arabic residents, Hemady refused to meet with him, evaluate him, and provide him necessary training. (*See* Jamaleddin Dep. at 139, Pg. ID 952; *see also id.* at 97, Pg. ID 941.) Jamaleddin has also presented evidence that he was required to work more hours

---

in *Yates* is consistent with how other courts of appeals have evaluated a plaintiff's duty to establish a *prima facie* case in the employment discrimination context. *See, e.g., Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent").

14

than residents of non-Arabic descent (*see* ECF #21-3 at 46-104, Pg. ID 957-1015), that he was reprimanded for failing to attend conferences that non-Arabic residents missed without reprimand (*see, e.g.,* Hemady Dep. at 88-90, Pg. ID 818-819), and that he was denied the ability to use vacation days at the beginning of his obstetrics rotation, even though a non-Arabic resident was allowed to take vacation during that same time period. (*See* Jamaleddin Affidavit, Exhibit P to ECF #21-3, Pg. ID 1017-1018).   Moreover, Jamaleddin asserts that Hemady made anti-Arabic comments to him on more than one occasion.  (*See* Jamaleddin Dep. at 95-96, Pg. ID 941.)  Taken as a whole and viewed in Jamaleddin's favor, all of this evidence is sufficient to support an inference that the Defendants harbored a discriminatory animus towards Jamaleddin due to his national origin, acted upon that animus in the past, and acted upon that animus again when they terminated his employment.

In response to Jamaleddin's evidence, Defendants argue that Jamaleddin "lacks credibility" and that the Court should not credit his testimony or evidence. (*See* Def.'s Reply Br., ECF #23 at 1, Pg. ID 1131.)   However, on summary judgment, the Court cannot make credibility judgments and must view all of the evidence, including Jamaleddin's testimony, in his favor.  "This Court takes no position on the credibility of either side – as that is the province of the finder of fact.  [The Court's] holding is limited to the recognition of a genuine issue of material fact concerning the *prima facie* case, as well as the issue of pretext as

discussed *infra*, that renders judgment as a matter of law unsustainable." *Yates*, 578 F.3d at 420. Jamaleddin has satisfied his *prima facie* case.

Accordingly, the burden shifts to the Defendants to offer a legitimate, non-discriminatory reason for Jamaleddin's termination. The Termination Letter says that Defendants fired Jamaleddin because on November 3, 2011, he "refused to complete [his] assigned patient care responsibilities" despite "repeatedly being told to do so by [his] floor chief resident and senior resident." (ECF #18-4 at 5, Pg. ID 147.) The Termination Letter further notes that this incident followed several warnings that Defendants had provided Jamaleddin that his behavior and conduct needed to improve. (*See id*.) The reason for Jamaleddin's termination listed in the Termination Letter is a valid, non-discriminatory reason. Defendants have satisfied their burden of production under *McDonnell Douglas*.

Thus, the burden shifts back to Jamaleddin to identify evidence that shows that Defendants' justification is pretextual. Jamaleddin can satisfy this requirement in one of three ways. He can show "(1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate [his termination], or (3) that [the proffered reason was] insufficient to motivate [his termination]." *Rachells*, 732 F.3d at 668. Jamaleddin has presented sufficient evidence to raise a material factual dispute as to whether Defendants' stated reasons for his discharge had a basis in fact and/or were sufficient to motivate his termination.

16

As noted above, the Termination Letter says that Defendants fired Jamaleddin because he "refused to complete" an assigned patient history on November 3. (ECF #18-4 at 5, Pg. ID 148.) However, Jamaleddin has presented evidence that he had permission to leave the hospital before he completed the patient history, that he arranged for another doctor to complete the patient history and, moreover, that he ultimately returned to the hospital and completed the assigned patient history that very evening. (*See* Jamaleddin Dep. at 90-91, Pg. ID 940; *see also* 136-137, Pg. ID 951.) Accordingly, there is a material factual dispute as to whether Defendants' primary stated reason for terminating Jamaleddin (i.e., his alleged refusal to complete the patient history) had a basis in fact.

Moreover, to the extent Defendants relied on his prior alleged lack of professionalism and deficient interpersonal skills as a secondary reason for his termination, Jamaleddin has presented evidence that those prior failings were insufficient to motivate his termination. (*See* Jamaleddin Dep. at 34-36, Pg. ID 926; *see also* 48-52, Pg. ID 929-930.) As noted above, Jamaleddin has presented evidence that he had immediately corrected many, if not all, of the flaws that he was made aware of (*see id.* at 28-30, Pg. ID 924-925), and he submitted positive performance reviews from the Oakland physicians who supervised him – reviews that, when viewed in Jamaleddin's favor, undercut the Defendants' claims that

17

Jamaleddin was a problem employee.  (*See, e.g.* Exhibit D to ECF #21-2, Pg. ID 851-882.)  This evidence raises a factual dispute as to whether the Defendants had a legitimate basis to rely on his alleged prior misconduct to justify his dismissal. There is, in short, a material factual dispute as to whether the reasons stated in the Termination Letter were pretextual.

Accordingly, for all of the reasons stated above, summary judgment on Jamaleddin's national origin discrimination claim would be improper.

### B.   Oakland Is Not Entitled to Summary Judgment on Jamaleddin's Breach of Contract Claim (Count V of the Complaint)

Defendants argue that Jamaleddin has "failed to establish a claim for breach of contract." (Def.s' Resp. Br. at 19, Pg. ID 131.)  The Court disagrees.  As noted above, the Residency Agreement specifically states that Oakland "shall not discriminate against [Jamaleddin] based on race, color, religion…[or]…national origin…." (Residency Agreement at § VIII, ¶ B, Pg. ID 794.)  As described in the previous section, the Court has determined that a material question of fact exists as to whether Defendants did in fact discriminate against Jamaleddin on the basis of his national origin.  If Oakland is found to have discriminated against Jamaleddin, it would necessarily be in breach of the anti-discrimination provision of the

Residency Agreement.[2]   Moreover, Jamaleddin has presented evidence that, despite Oakland's promise in the Residency Agreement to "provide [him] a training program" (*id.* at § II), Hemady, his Program Director, refused to train or even meet with him.  This too, if proven, would suggest a breach of the Residency Agreement.  Thus, for all of the reasons explained above, summary judgment is not appropriate on Jamaleddin's breach of contract claim.

## C.   Defendants Are Entitled to Summary Judgment on Jamaleddin's Retaliation Claims (Counts II and IV of the Complaint)

To establish a *prima facie* claim for retaliation under Title VII, Jamaleddin must demonstrate that "(1) [he] has engaged in Title VII-protected activity; (2) [his] employer had knowledge of this fact; (3) [he] suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action."   *Clay*, 501 F.3d at 713. "But for" causation between the protected activity and the adverse employment action must also exist. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013). "But for" causation exists where "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*  The requirements for a retaliation claim brought under the ELCRA are similar.  *See In Re Rodriguez*, 487 F.3d 1001, 1011 (6th Cir. 2007)) ("A plaintiff alleging

---

[2] Jamaleddin, however, would not be entitled to a double recovery should a jury find that Oakland discriminated against him in violation of both the Residency Agreement and Title VII/the ELCRA.

retaliation in violation of the ELCRA must establish the following elements of a prima facie case: (1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action") (quoting *Barrett v. Kirtland Comm. Coll.,* 628 N.W.2d 63, 70 (Mich. App. 2001)).  Moreover, "[t]o establish causation [under the ELCRA], the plaintiff must show that his participation in activity protected by the ELCRA was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Id.*

Jamaleddin asserts that he complained to Hemady on November 3 that he was being overworked due to his national origin, and Defendants retaliated against him for that complaint by requiring him to work additional hours and terminating his employment a week after his complaint.   However, Jamaleddin has failed to establish the required causal connection between his complaint and these adverse employment actions.  First, he has not shown that his complaint led to his allegedly burdensome workload.  Indeed, Jamaleddin repeatedly insists in this litigation that he was overworked because he was Arabic – not because he complained – and the alleged overworking began long before Jamaleddin allegedly lodged his complaint with Hemady on November 3.  There is no basis on which to conclude that the

alleged complaint led to an unduly burdensome work schedule for Jamaleddin during the 7 days between the complaint and his discharge.

Second, Jamaleddin has not shown that his alleged complaint led to his termination. The only link between Jamaleddin's complaint and his firing is that they happened during a seven-day window of time. But, as Jamaleddin himself concedes, "temporal proximity alone is not enough" to state a cognizable retaliation claim. (*See* Pla.'s Br., ECF #21 at 23, Pg. ID 784.) Jamaleddin has presented no evidence, apart from timing, that his alleged "protected activity" was a "significant" or "but for" cause of the termination of his employment. Defendants are therefore entitled to summary judgment on Jamaleddin's Title VII and ELCRA retaliation claims.

## CONCLUSION

For all of the reasons stated in this Opinion and Order, Defendants' Motion for Summary Judgment (ECF #18) is hereby **GRANTED IN PART AND DENIED IN PART**. Defendants are **GRANTED** summary judgment with respect to Jamaleddin's claims for retaliation under Title VII and ELCRA (counts II and IV of the Complaint). Defendants' request for summary judgment is **DENIED** in all other respects.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: January 12, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 12, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113